THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GEORGE CANTRELL, Defendant-Appellant.

First District (4th Division)    No. 77-243

Opinion filed December 13, 1979.

James J. Doherty, Public Defender, of Chicago (Frances Sowa, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (William Gamboney, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

Following a trial without a jury in the circuit court of Cook County, the defendant, George Cantrell, was found guilty of perjury (Ill. Rev. Stat. 1973, ch. 38, par. 32—2) and sentenced to a term of six months periodic imprisonment. A second count of perjury was dismissed, and the defendant was found not guilty of obstruction of justice.

The indictment alleged that the defendant falsely stated to the grand jury that he did not have a portion of a certain conversation with Joseph Ettinger. It also charged that the conversation in question was material to the issue of whether the defendant had knowledge of or participated in planting false evidence, a gun, near the body of Clarence Torry. On appeal, the defendant argues the indictment was insufficient to charge perjury; that he was not proved guilty beyond a reasonable doubt; and that the State did not prove his testimony was perjured rather than the result of an imperfect memory.

On April 19, 1973, Willie Stokes shot Torry eight times in an alley near 47th Street and Indiana Avenue in the City of Chicago. The defendant, an off-duty Chicago police officer, had seen Stokes and Torry enter the alley. The defendant and Stokes had been acquainted for a number of years. The defendant and another off-duty Chicago police officer heard shots in the alley and rushed to the scene. They found Stokes holding a gun and Torry lying on the ground. There was another gun on the ground near Torry. The gun on the ground is the false evidence described in the indictment which was allegedly planted near Torry. Stokes and his son, who was also present at the scene, told the officers that Torry had attempted to rob Stokes. Charges of unlawful use of weapons, failure to register a gun and possession of a stolen gun were subsequently filed against Stokes. Torry was charged with attempt robbery, unlawful use of weapons, and other gun charges.

In an unrelated incident several days after the shooting, Stokes was arrested by another police officer who alleged that Stokes had offered him $3000 to kill certain members of the Blackstone Rangers, a Chicago street gang. Stokes was charged with solicitation to commit murder.

Joseph Ettinger, an attorney who was representing Stokes, wrote a letter to the State's Attorney claiming the defendant had entrapped Stokes

into committing the solicitation. The State's Attorney authorized the placement of an eavesdropping device upon Ettinger.

On May 21, 1973, the defendant appeared in court with Stokes and Ettinger in a proceeding related to the shooting. The defendant told the prosecutor that Stokes would testify against the shooting victim in a robbery case. The gun charges pending against Stokes were dropped. Ettinger invited the defendant back to his office where he taped their conversation. The transcript of this conversation is 102 pages. Most of the conversation concerns the solicitation to commit murder charges pending against Stokes. During the conversation, Ettinger changed the subject to the shooting of Torry and, more particularly, to the gun found on the ground next to Torry. The transcript of that part of the conversation, which is quoted in the indictment, is as follows:

"Ettinger: George [Cantrell], where did that gun come from?

Cantrell: Counsellor, I'd rather not say, I'll take the fifth.

Ettinger: Okay.

Cantrell: It wasn't mine.

Ettinger: It wasn't your gun?

Cantrell: No.

Ettinger: And it wasn't the guy's on the ground?

Cantrell: *It is now.*

Ettinger: It is now. He just bought a gun. He just bought a gun, huh?

Cantrell: Yeah." (Emphasis added.)

Two months later at a grand jury proceeding, the defendant was told that the grand jury was investigating allegations of possible official misconduct, or conspiracy, or obstruction of justice in connection with charges involving Stokes. He was also told that Stokes made certain allegations that the grand jury was considering which "may reflect upon yourself." The defendant then testified that he knew Stokes to be a gambler, pool hustler, a seller of narcotics and that he had three or four prostitutes working for him. The defendant said he shoots pool and had met Stokes in the pool hall. He also said that when he arrived at the scene of the shooting he saw the gun next to Torry's right hand. He responded in the negative when asked "Do you know whose gun that was?" He also said he did not know whether the gun had been planted there by someone. He stated that six or seven days after the shooting he heard that the gun belonged to Stokes' son. He said he had learned that from the grapevine, but that he had no personal knowledge of it. The transcript of the grand jury proceeding at this point reads as follows:

"Q. Did you ever have a conversation with Mr. Joseph Ettinger?

A. Yes, sir.

Q. And the conversation would be in substance that he asked

you if you knew where that gun came from, and you said you would rather not say, you would take the fifth?

A. Right.

Q. Mr. Ettinger said okay, and you said it was not mine. And Mr. Ettinger said it was not your gun, and you said no. Mr. Ettinger then responded, and it was not the guy's on the ground, and you said it is now. Mr. Ettinger saying it is now, he just bought a gun; he just bought a gun, and you said yes?

A. No.

Q. You never had that conversation?

A. No, I had a conversation, but *I did not say nothing about the gun was his now.*

Q. You didn't say what I read back to you?

A. No, but I did have a conversation with him, but I did not say that the gun was his now.

Q. What did you say?

A. I said that is the way the case went down in the alley, and the gun belonged to Stokes, that was his statement. I didn't find out until six or seven days later it did not belong to Stokes.

Q. You didn't know that?

A. I just picked it up as a rumor. No, I couldn't say.

Q. But you did have that conversation in substance, the one I just indicated?

A. I had a conversation, yes.

Q. But that was not the conversation?

A. No.

Q. So, that would be an incorrect allegation?

A. Right, yes, sir.

Q. And you would say whoever said that you had that type of conversation would be lying, is that correct?

A. Yes,sir." (Emphasis added.)

In finding the defendant guilty of one count of perjury, the trial judge stated the finding was not based on Stokes' testimony but rather that it was based primarily on the defendant's own words as recorded in the conversation with Ettinger when compared with the defendant's statements before the grand jury.

On appeal, the defendant argues he was not proved guilty beyond a reasonable doubt because his denial of the words "It is now" will not support a perjury conviction. He contends even deliberately false testimony to an immaterial matter does not constitute perjury and that his taped statements to Ettinger were immaterial because he did not actually admit that he knew about a planted gun.

The State argues the defendant's denial of the "It is now" statement is material to the issue of whether he had knowledge of or participated in the planting of false evidence on Torry. The State contends "It is now" can only be interpreted to mean the defendant knew the gun did not belong to Torry before the shooting and that it had been planted on Torry after the shooting.

During his grand jury testimony, the defendant admitted making most of the statements quoted in the indictment: he admitted being asked if he knew where the gun came from and he admitted responding that he would rather not say, that he would take the fifth; he also admitted saying it was not his own gun. The only words quoted in the relevant portion of the indictment which the defendant denied saying were "It is now" in response to Ettinger's question phrased "And it wasn't the guy's on the ground?"

■■ To sustain a perjury charge, the State must prove that the defendant made the false statement attributed to him, that the statement was material to the issue or point in question, and that he did not believe it true. Ill. Rev. Stat. 1973, ch. 38, par. 32—2; *People v. Drake* (1978), 63 Ill. App. 3d 633, 380 N.E.2d 522.

The inconsistency between the statement made to Ettinger and the denial of that statement during the proceeding before the grand jury is patent. The question then becomes, was the denial of this statement material to the issue of whether the defendant had knowledge of or participated in the planting of false evidence on Torry.

■ Materiality is a question of law for the court. (*People v. Mason* (1978), 60 Ill. App. 3d 463, 376 N.E.2d 1059.) A number of tests have been used to determine whether or not a point is material. (See *Mason*, 60 Ill. App. 3d 463, 465-66, 376 N.E.2d 1059, 1061.) The *Mason* court stated that "[t]he crux of the crime of perjury is the use of knowingly false information under oath before a court or jury where the information would or could influence the trier of fact." 60 Ill. App. 3d 463, 466, 376 N.E.2d 1059, 1061.

■ A plain reading of the statement and the subsequent denial in the context of the discussions in Ettinger's office and before the grand jury shows considerable ambiguity. The material issue as phrased in the indictment is the defendant's knowledge of or participation in the planting of false evidence. At the grand jury proceeding the defendant admitted that he gained some knowledge of the false evidence five or six days after the shooting when he heard on the grapevine that the gun belonged to Stokes' son. Additionally, the defendant told Ettinger and admitted to the grand jury that when asked if he knew where the gun came from, he responded he would rather not say and that he would "take the fifth." These admissions of knowledge lead us to conclude that

the defendant's denial of having made the earlier statement could not have influenced the grand jury on the question of what knowledge he possessed. The State's interpretation of "It is now" to mean the defendant knew the gun did not belong to Torry before the shooting and that it had been planted on Torry after the shooting requires too much extrapolation; the required inferences are too tenuous to allow the defendant's conviction to stand.

The resolution of this issue in the defendant's favor obviates the need to consider the sufficiency of the indictment.

Reversed.

LINN and ROMITI, JJ., concur.